# EXHIBIT "A"

Craig F. Szemple, pro se
Northern State Prison
168 Frontage Road
P.O. Box 2300
Newark, NJ  07114

---

| | |
|---|---|
| CRAIG FRANCIS SZEMPLE,       : | UNITED STATES DISTRICT COURT DISTRICT OF NEW JERSEY |
| Plaintiff,       : | |
| v.       : | No. 19-12746 (PGS)(DEA) |
| GARY LANIGAN; RUTGERS, THE       : STATE UNIVERSITY OF NEW JERSEY, UNIVERSITY CORRECTIONAL  : HEALTH CARE; ART BREWER; WILLIAM BRIGLIA; MICHELLE       : RICCI; GEORGE ROBINSON; SANDRA CONNELLY; SHARMALIE       : PERERA; NURSE REGISTER; APN LATIA FEDEI; ST. FRANCIS       : MEDICAL CENTER; JOHN DOE ##1-3; and JANE DOE ##1-2,       : individually, jointly, and severally,       : | Civil Action  FIRST AMENDED COMPLAINT AND JURY DEMAND |
| Defendants. | |

---

### Preliminary Statement

Plaintiff is a prisoner committed to the custody and care of the New Jersey Department of Corrections.  Plaintiff was repeatedly injured by defendants during transportation to and from medical appointments in vans that failed to provide adequate accommodations for the safe transport of those with serious medical conditions and physical disabilities. Despite their knowledge of the unsafe conditions of the vans, and despite their knowledge of injuries suffered by plaintiff and other prisoners during previous transports, defendants continued to maintain the system of using the unsafe vans

and refused to make reasonable accommodations for plaintiff's medical condition and physical disabilities, depriving plaintiff of prescribed medical treatment on two occasions in 2017, and forcing plaintiff to ride in the unsafe van for medical treatment in 2018 when the van was driven in such a wanton and reckless fashion as to cause plaintiff to suffer severe physical injury. Defendants then denied plaintiff adequate medical care after being injured in the van during transport, altered medical records to conceal plaintiff's injuries, and withheld medical treatment for non-medical reasons, including for discriminatory reasons based on his religious identity. Plaintiff seeks compensatory, consequential, and punitive damages, as well as injunctive relief requiring appropriate safety features for transport vans and appropriate accommodations for those transported in vans to and from medical appointments.

### Parties

1.  Plaintiff Craig Francis Szemple is a prisoner committed to the custody and care of the New Jersey Department of Corrections and is currently confined at Northern State Prison, 168 Frontage Road, P.O. Box 2300, Newark, NJ 07114.

2.  Defendant Gary Lanigan is the former Commissioner of the New Jersey Department of Corrections (NJDOC) responsible for the safe custody and care of prisoners.

3.  Defendant Rutgers, The State University of New Jersey, University Correctional Health Care (UCHC) is an entity that provides inmate health care services to the NJDOC and to plaintiff.

4.  Defendant Art Brewer is believed to be employed by UCHC and at all times herein was responsible for providing health care services to plaintiff.

2

5. Defendant William Briglia is believed to be employed by UCHC and at all times herein was responsible for providing health care services to plaintiff.

6. Defendant Michelle Ricci is an employee of the NJDOC and at all times herein was responsible for plaintiff's safe custody and care.

7. Defendant Sandra Connolly is believed to be employed by UCHC and at all times herein was responsible for providing health care services to plaintiff.

8. Defendant Sharmalie Perera is believed to be employed by UCHC and at all times herein was responsible for providing health care services to plaintiff.

9. Defendant Nurse Register is believed to be employed by UCHC and at all times herein was responsible for providing health care services to plaintiff.

10. Defendant APN Latia Fedei is believed to be employed by UCHC and at all times herein was responsible for providing health care services to plaintiff.

11. Defendant St. Francis Medical Center (SFMC) is an entity that provides inmate health care services to the NJDOC and to plaintiff.

12. Defendants John Doe ##1-3 and Jane Doe ##1-2 are fictitious names of individuals particularly described in this complaint by their specific acts and whose names can only be determined by reference to information in the exclusive possession of the NJDOC and/or UBHC and/or SFMC.

<u>Factual Background</u>

13. Plaintiff was committed to the custody and care of the NJDOC in or around 1994 and was shortly thereafter housed at the New Jersey State Prison (NJSP). Plaintiff has subsequently been transferred to various prison facilities, including East Jersey State Prison (EJSP), Northern State Prison (NSP), and South Woods State Prison (SWSP).

3

14. Plaintiff entered NJSP without any specific abdominal complaints and in overall excellent health, however, during the course of confinement he developed a number of medical problems. This includes diagnoses for duodenal ulcers, anemia, prediabetes, ulnar nerve entrapment, arthropathy of the left shoulder, arthritis and joint effusion of the left and right knees, total left knee replacement, degenerative joint disease of the cervical spine, hypertension, hypercholesterolemia, and coronary artery disease requiring open heart surgery in 2001 to perform a quadruple bi-pass.

15. Additionally, plaintiff suffers chronic pain in connection with a debilitating, degenerative spinal disease. Over the years, plaintiff has received multiple MRIs of the cervical and lumbar regions of his spine. The MRI evidence reveals prominent degenerative disease with major changes at the C-5, C-6 with thecal sac narrowing, cord impingement and narrowing of left-foramina, spondylosis and disc bulging in the lumbar section of the lower spine.

16. Plaintiff has a record of diagnosed physical impairments that substantially and severely restrict his ability to perform tasks of central importance to his daily life, especially his ability to use his hands, knees, and back, affecting his ability to walk, bend, and lift. As a result of his medical condition, he frequently needs to be transported for medical treatment to and from community-based medical facilities like SFMC.

17. Prisoners are transported to and from court and medical appointments by the NJDOC's Central Transportation Unit (CTU). Between 2014-2015, the CTU changed the type of vehicles used to transport prisoners, switching from passenger vans with cushioned seats and seat belts to cargo vans. The cargo section of the vans were nothing more than steal enclosures fitted with two steal bench seats running lengthwise along the

4

inside of both side panels. No cushioning of any kind is provided for protection from injury and no seatbelts are provided. Prisoners are forced to ride in the vans shackled and handcuffed, with handcuffs additionally attached to waste chains, all of which severely limits the prisoner's ability to move his or her hands and feet to balance, brace and protect themselves during the trips.

18. CTU drivers often exceed posted speed limits while transporting prisoners, and have been known to recklessly drive at speeds in excess of 90 mph on highways like the New Jersey Turnpike, swerving in and out of traffic, bouncing their prisoner cargo off the walls of the interior of the vans or launching prisoners airborne to come crashing down on their spines when going over bumps.

19. The cargo vans used by CTU are believed to be identical to the vans used by police in the City of Baltimore, Maryland, that received national attention when, on April 12, 2015, Freddie Carlos Gray, Jr., a 25-year-old African American, was arrested for possessing a knife. While being transported in the van, Gray sustained such severe injury to his spinal cord that he died of his injuries on April 19, 2015.

20. Numerous New Jersey prisoners have sustained serious injuries while being transported by CTU, while others have lost their lives due to reckless driving causing accidents during transport.

21. For example, on Thursday, January 21, 2016, prisoner Jerry Siracusa, 44, from Elizabeth, was killed when the NJDOC van in which he was a passenger crashed into the rear end of a flatbed tow truck on Route 55. Another prisoner, Raul Salazar, 30, was injured in the crash.

5

22. The unsafe conditions of the vans, and the numerous complaints, injuries and death caused to prisoners during transport, are well known to defendants and prisoners alike.

23. As a result of the foregoing, prisoners in New Jersey refer to the vans used by CTU as the Freddy Gray "Death Van."

24. By January 2015, a significant number of prisoners had refused medical appointments which required transport by the CTU because of fear of riding in the Death Vans. The refusals are ordinarily recorded by the prison's medical department as well as NJDOC-CTU.

25. The increasing number of prisoners refusing transport in the Death Vans can be attributed to a custom and practice on the part of the NJDOC-CTU of discouraging prisoners from seeking medical care. The custom and practice begins when prisoners arrive in holding pens to await transport. CTU officers then subject prisoners to a degrading strip search. After the search, prisoners are dressed and then handcuffed, their handcuffs are then secured to waste chains. They are then leg shackled. Only then are prisoners told that they will be transported in the Death Van and that, "because of over booking for medical appointments the space in the vans will be tight." CTU officers then ask prisoners waiting to be transported: "who wants to refuse the appointment?" As a consequence, many prisoners with serious medical conditions refuse medical trips, foregoing potentially life-saving treatments. NJDOC-CTU officers realize that the practice discourages prisoners from seeking medical treatment and yet the defendants have turned a blind eye to the serious medical needs of prisoners solely for economic

6

reasons and convenience, knowing that fewer prisoners going on medical trips reduces the cost of providing needed medical care for prisoners.

26. In or around April 2016, plaintiff was required to undergo an operation to repair an inguinal hernia. Plaintiff was transported back to the prison from the hospital in the Death Van. During the trip, the CTU driver drove the van in such a reckless fashion that plaintiff was hurled from an unsecured seat in the back of the van, causing the sutures and surgical staples used in the inguinal hernia operation to rip open, necessitating a return trip to the hospital in December 2016 to surgically repair the wound.

27. As a result of the foregoing incident, and in recognition of both the actual injury that occurred during transport, and the potential for injury to plaintiff arising from his physical disabilities, an accommodation was made to transport plaintiff to medical appointments in the back of an ambulance or wheelchair accessible van. The accommodation was made by a top nursing manager, Dolores Guida, who placed plaintiff's name on an "exception list," which is a standing medical order and notification to transport a prisoner to medical appointments by wheelchair accessible vans or ambulances. The "exception list" notification was conspicuously placed in plaintiff's electronic medical records (EMR).

28. In 2016, plaintiff was transported for needed medical treatment by the CTU on six occasions. On each such occasion, plaintiff specifically informed the CTU drivers that he been placed on the exception list for transport by ambulance or a wheelchair accessible van to accommodate his medical condition and disabilities. But on each

7

occasion the CTU drivers refused to perform a lookup to determine whether the accommodation had been made, forcing plaintiff into the Death Van over his objection.

## Facts Related to Claims

29. Plaintiff incorporates herein paragraphs 1 through 28 as though set forth in full.

30. Between June 2017 and September of 2017, while housed at Northern State Prison (NSP), plaintiff submitted a number of grievances through the inmate remedy system as well as written requests to prison officials and medical personnel. The grievances and written requests were addressed to:

- Gary Lanigan, commissioner of the NJDOC, responsible for implementing the practice of using the Death Van to discourage prisoners from seeking ancillary medical treatment;

- Michelle Ricci, then director of operations (now assistant commissioner division of operations, responsible for the implementation of policies governing operation of the CTU;

- George Robinson, administrator of NSP, responsible for ensuring that prisoners at NSP receive needed medical treatment;

- Dr. Art Brewer, statewide medical director for UCHC responsible for providing healthcare services to all NJDOC prisoners;

- Dr. William Briglia, regional medical director for the northern region responsible for providing healthcare services to prisoners at NSP;

- Dr. Sharmalie Perera, medical director at NSP responsible for providing healthcare services to prisoners at NSP; and

- Dr. Sandra Connelly, an internist at NSP.

31. In his grievances, plaintiff complained about the failure of Lanigan, Ricci, Robinson, Brewer, Briglia, Perera, and Connolly to remedy previous complaints about

8

the dangerous conditions of transport in the Death Van, failing to train CTU drivers to perform lookups for transport accommodations, ignoring the "exception list" order prescribed by Nurse Guida, failing to document injuries occurring in the Death Van, and failing provide medical treatment for injuries sustained in the Death Van.

32. The above-mentioned grievances and written requests provided a detailed history of plaintiff's experiences in the Death Van, as well as his injuries and lack of medical care. Moreover, in regard to future transport, plaintiff specifically asked the foregoing defendants to accommodate his physical disabilities by arranging for him to be transported by ambulance or at the very least a wheelchair accessible van when he was taken to his medical appointments.

33. Plaintiff never received a response to his grievances from any of the foregoing defendants.

34. In or around September 2017, while confined at Northern State Prison, plaintiff was scheduled for a number of necessary medical treatments and procedures. On one such occasion, when plaintiff realized that he was to be taken to the hospital in the Death Van, plaintiff told Dr. Sandra Connolly that he was supposed to be transported by ambulance or a wheel chair accessible van, and that a provision by Nurse Guida for such an accommodation was in his EMR record. Dr. Connolly told plaintiff that she was aware of his grievances about being injured during his medical trips and his complaints about being denied a transport accommodation but then stated that a decision had been made "downtown" that plaintiff would not be transported to and from hospital trips in an ambulance or wheelchair accessible van as ordered by Nurse Guida because she (Dr. Connolly) was told that she should just ignore Nurse Guida's order and that these

9

decisions were made by her immediate supervisor, Dr. Perera, by the statewide medical director, Dr. Art Brewer, by the regional medical director, Dr. William Briglia, by the prison's administrator, George Robinson, by the NJDOC's director or operations, Michelle Ricci, and by the NJDOC's commissioner, Gary Lanigan. Connolly then said, "furthermore, I do not care," expressly ignoring the risk of injury to plaintiff. Connelly said she would continue to ignore the transport accommodation as long as her supervisor and the department heads directed her to do so.

35. Connolly further indicated that she was directed by her supervisor, Dr. Perera, to discontinue plaintiff's pain medications and medical procedures, saying they were too costly for UCHC.

36. Shortly thereafter, when plaintiff requested copies of his EMR, he discovered that the standing order for medical transport previously issued by Nurse Guida had been removed from his EMR, and that certain medications that had been prescribed to manage his medical conditions and pain were discontinued.

37. As a direct consequence of the foregoing actions by the above-referenced defendants, which included the discontinuation of prescribed medications and procedures, and the purging of the medical transport order from plaintiff's EMR, plaintiff was deprived prescribed medications and treatments, and refused medically appropriate transport accommodations, resulting in unnecessary physical debilitation and pain and the denial of medically prescribed treatment that had been scheduled at SFMC on two separate occasions in 2017.

38. On or about October 15, 2018, plaintiff was listed for transport to SFMC for a prescribed CAT scan. Plaintiff informed defendant John Doe 1 about his medical

10

condition and the need for transport in a wheelchair accessible van or ambulance, and then asked John Doe 1 to inquire about the medical transport accommodation that had previously been a part of his EMR, but John Doe 1 responded that he would not make any such inquiry, stating: "We don't make accommodations for prisoners."

39. As a result of the foregoing, plaintiff was forced to ride in the Death Van. During the trip, the driver, defendant John Doe 2, drove well in excess of the posted speed limit and in such a reckless manner as to cause plaintiff to be violently bounced off the walls of the cargo hold and thrown to the floor, further causing plaintiff to suffer severe injury and pain to his spine and lower abdomen, resulting in visible black-and-blue bruising over his torso and extremities. John Doe 2 refused to report plaintiff's injuries during the trip in an effort to cover up his actions with the result that plaintiff was denied timely medical treatment for injuries, including an umbilical hernia and bilateral hydroceles.

40. SFMC staff were aware that plaintiff suffered severe injuries during his transport on October 15, 2018, and that such injuries would require medical treatment, yet SFMC staff working in the hospital's prison unit, and particularly Jane Doe 1 and John Doe 3, refused to document the injuries that plaintiff suffered during transport, with the direct result of concealing plaintiff's injuries during transport and, thereby, frustrating emergency medical treatment of plaintiff's injuries and pain, including an umbilical hernia and bilateral hydroceles that surgeons at SFMC diagnosed as needing surgery.

41. When plaintiff was returned to the prison, he was given a routine physical examination as is customary following medical trips outside of the prison. The examining nurse, defendant Jane Doe 2, recorded in the EMR that plaintiff had visible bruising on

11

his torso and extremities that were not present when plaintiff left the prison to be treated at SFMC; however, another nurse, defendant Nurse Register, urged Jane Doe 2 to change the EMR injury report, which Jane Doe 2 did, thereby deleting any reference to plaintiff's injury on the trip or the visible bruising on plaintiff's body.

42.  As a direct result of the omissions by SFMC staff, and the alteration of the EMR injury report following the October 15, 2018, trip to SFMC, plaintiff was denied needed medical treatment for his injuries and for pain, including needed surgery for an umbilical hernia and bilateral hydroceles.

43.  When plaintiff confronted Dr. Connolly and Dr. Perera the next day about the injuries and the alteration of the EMR injury report, Dr. Connolly and Dr. Perera ignored the claim.  Although Dr. Connolly and Dr. Perera both examined plaintiff physically, observed the bruising, and caused plaintiff to recoil in pain when touching the bruised areas on his body, they refused to report those findings in plaintiff's EMR and refused to provide any medical treatment.  Instead, the reply that plaintiff received from Connolly and was: "Pain is good for you, deal with it."  Dr. Perera, who overheard the conversation, took no action to correct Connelly's remarks.

44.  When plaintiff complained to APN Latia Fedei about the increased level of untreated pain that he was experiencing, Fedei ignored plaintiff's complaint and refused to conduct any medical evaluation.  Instead, Fedei, a person of Arab descent, made the following responsive remarks: "You Americans are weak, especially you Jews.  In the Middle East, we don't take pain meds and we built the pyramids without doctors or nurses to care for us. America is a weak country and the Jews are the worst of the lot." Plaintiff, an observant Jew, after having been deprived a medical evaluation for

being a "Jew," upon hearing these anti-Semitic ravings, and not wanting to be further berated for his religion, got up and walked out of Fedei's office. Connolly and Perera were present when Fedei berated plaintiff for being Jewish but failed to intervene and even encouraged Fedei to do so.

45. As a consequence of the foregoing, and as a direct result of the concealed injuries that plaintiff suffered while being transported in the Death Van, plaintiff was refused medical evaluation for his injuries and pain.

### Exhaustion of State Remedies

46. Plaintiff incorporates herein paragraphs 1 through 45 as though set forth in full.

47. On or about October 30, 2018, plaintiff submitted a formal administrative remedy form to the NJDOC complaining about being denied adequate medical care for his injuries on October 15, 2018, withholding medical treatment due to his religious identity, denial of adequate accommodations for his medical condition and disabilities, failure of medical staff to report his injuries, the purging of information from his medical record, and the failure to provide an adequate remedy system. Plaintiff never received a response to his remedy.

48. On or about October 30, 2018, plaintiff hand delivered a statutory Notice of Claim to prison officials for service on the State of New Jersey pursuant to the New Jersey Tort Claims Act. Since the service of his Notice of Claim, more than six months have elapsed without any response from the State of New Jersey.

13

## Jurisdiction and Venue

49. Plaintiff incorporates herein paragraphs 1 through 48 as though set forth in full.

50. This action is brought under the Eighth and Fourteenth Amendments to the United States Constitution, the Civil Rights Act, 42 U.S.C. §§§ 1983, 1985(3), and 1986; Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, et seq.; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a); and New Jersey common law.

51. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because plaintiff seeks compensatory and punitive damages for the deprivation under color of state law of certain rights of a citizen of the United States secured by the United States Constitution and federal law as set forth above.

52. This Court has supplemental jurisdiction over claims brought under New Jersey Law pursuant to 28 U.S.C. § 1367.

53. Venue is proper under 28 U.S.C. § 1391(b)(2) because the events giving rise to plaintiffs' claims occurred in this judicial district.

## First Cause of Action

### Deprivation of Eighth and Fourteenth Amendment Rights,
### contrary to 42 U.S.C. § 1983

(Individual Capacity Claims Against Gary Lanigan, UCHC, Art Brewer, William Briglia, Michelle Ricci, George Robinson, Sandra Connelly, Sharmalie Perera, Nurse Register, APN Latia Fedei, SFMC, John Doe ## 2-3, and Jane Doe ##1-2)

14

54. Plaintiff incorporates herein paragraphs 1 through 53 as though set forth in full.

55. Defendants Gary Lanigan, UCHC, Art Brewer, William Briglia, Michelle Ricci, George Robinson, Sandra Connelly, Sharmalie Perera, Nurse Register, APN Latia Fedei, SFMC, John Doe ##2-3, and Jane Doe ##1-2 (the "§ 1983 Individual Defendants"), are liable to plaintiff for their acts, omissions, and failure to supervise, as set forth herein:

    a) Defendants Lanigan, Ricci and Robinson participated in violating plaintiff's rights, directed others to violate those rights, or, as persons in charge, had knowledge of and acquiesced in their subordinates' violations, by:

        1. Instituting and maintaining a policy, practice and custom of using Death Vans in the CTU despite actual knowledge that the Death Vans were unsafe and were causing prisoners, including plaintiff, to suffer serious injuries; and

        2. Directing Perera and Connolly to refuse plaintiff's request for an accommodation for his disabilities so he could be safely transported to receive prescribed medical treatments resulting in plaintiff's having been deprived prescribed medical treatment on two occasions in 2017, and resulting in plaintiff's having been seriously injured during transport on October 15, 2018.

    b) Defendants Lanigan, UCHC, Brewer, Briglia, Ricci, and Robinson participated in violating plaintiff's rights, directed others to violate those

rights, or, as persons in charge, had knowledge of and acquiesced in their subordinates' violations, by:

1. Instituting and maintaining a policy, practice and custom of refusing to respond to or remedy grievances from prisoners, including plaintiff, complaining about the unsafe conditions in the Death Vans, injuries suffered in the vans, the concealment of those injuries by staff, and the lack of medical care to treat those injuries; and

2. Directing Perera and Connolly to refuse plaintiff's request for an accommodation for his disabilities so he could be safely transported to receive prescribed medical treatments resulting in plaintiff's having been deprived prescribed medical treatment on two occasions in 2017, and resulting in plaintiff's having been seriously injured during transport on October 15, 2018.

c) Defendant Perera participated in violating plaintiff's rights, directed others to violate those rights, or, as a person in charge, had knowledge of and acquiesced in her subordinates' violations, by:

1. Directing Connolly to refuse plaintiff's request for an accommodation for his disabilities so he could be safely transported to receive prescribed medical treatments resulting in plaintiff's having been deprived prescribed medical treatment on two occasions in 2017, and resulting in plaintiff's having been seriously injured during transport on October 15, 2018.

2. Directing Connolly to discontinue medication that had been prescribed for plaintiff's medical condition and pain for non-medical reasons related to

16

the cost of care, causing plaintiff to unnecessarily suffer further physical debilitation and pain.

d) Defendant John Doe 1 consciously ignored and serious and substantial risk of injury to plaintiff when, after being made aware of plaintiff's need for transport in a wheelchair accessible van or ambulance, and after being asked to inquire about the medical transport accommodation that had previously been made by medical staff, he refused to make any inquiry, stating: "We don't make accommodations for prisoners," resulting in plaintiff being seriously injured on October 15, 2018.

e) Defendant John Doe 2 caused plaintiff to suffer severe injuries during the transport on October 15, 2018, by driving the Death Van in excess of the posted speed limit and in a wanton and reckless fashion and then violated plaintiff's right to adequate medical care by refusing to report plaintiff's injuries in order to conceal those injuries from authorities.

f) SFMC, Jane Doe 1, and John Doe 3 were aware that plaintiff suffered severe injuries during his transport on October 15, 2018, and that said injuries required emergency medical treatment, and yet said defendants refused to evaluate plaintiff and refused to document the injuries that plaintiff suffered during transport with the direct result of concealing plaintiff's injuries during transport and, thereby, frustrating timely medical treatment of plaintiff's injuries and pain.

g) Defendants Jane Doe 2 and Nurse Register altered the medical record of plaintiff's injuries on October 15, 2018, in order to conceal the injuries

17

suffered by plaintiff in the Death Van and then deprived plaintiff medical treatment for his injuries and pain.

h) Defendants Connolly and Perera deprived plaintiff of medical care by:

1. Refusing to provide an accommodation for plaintiff's disabilities so he could be safely transported to receive prescribed medical treatments resulting in plaintiff's having been deprived prescribed medical treatment on two occasions in 2017, and resulting in plaintiff's having been seriously injured during transport on October 15, 2018.

2. Discontinuing medication that had been prescribed for plaintiff's medical condition and pain for non-medical reasons related to the cost of care, causing plaintiff to unnecessarily suffer further physical debilitation and pain.

3. Purging from plaintiff's EMR the transport accommodation previously prescribed by Nurse Guida.

4. Refusing to report plaintiff's injuries in his EMR after having physically examined and observed the injuries caused on October 15, 2018, refusing to provide plaintiff treatment for his injuries and pain, and refusing to investigate plaintiff's claim that Nurse Register and Jane Doe 2 altered the initial EMR report of his injury.

i) Defendant APN Latia Fedei deprived plaintiff of needed medical treatment for non-medical reasons after expressing a discriminatory bias against treating plaintiff for his pain because he is Jewish.

18

56. As a result of the foregoing, the § 1983 Individual Defendants deprived plaintiff of his constitutional right to adequate medical care, accurate medical records needed to provide adequate medical care, personal safety, physical integrity, and freedom from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution.

57. At all times relevant herein, the § 1983 Individual Defendants were acting under color of the law of the State of New Jersey.

58. The conduct by the § 1983 Individual Defendants constituted deliberate and outrageous indifference to plaintiff's constitutional rights, and the § 1983 Individual Defendants abused their authority by acting with deliberate indifference to, and with reckless, willful and callous disregard for, the known substantial risk of injury to plaintiff, in deprivation of his constitutional rights.

59. As a direct and proximate result of the foregoing deliberate indifference on the part of the § 1983 Individual Defendants, plaintiff suffered serious physical, mental, psychological and emotional injury, including pain and suffering.

60. For the foregoing deprivations of plaintiff's constitutional rights, the § 1983 Individual Defendants are liable in their individual capacities for compensatory damages, punitive damages, and reasonable attorney fees and costs, as permitted under 42 U.S.C. §§ 1983 and 1988.

### Second Cause of Action

Conspiracy to Violate Civil Rights, 42 U.S.C. § 1985

(Individual Capacity Claims Against Sandra Connelly,
Sharmalie Perera, and APM Latia Fedei)

19

61. Plaintiff incorporates herein paragraphs 1 through 60 as though set forth in full.

62. Defendants Sandra Connelly, Sharmalie Perera and Latia Fedei (the "§ 1985 Individual Defendants"), are liable for conspiring to deprive plaintiff equal access to medical care for non-medical reasons based on a discriminatory animus against plaintiff's Jewish religion.

63. As a result of the foregoing, the § 1985 Individual Defendants deprived plaintiff of his constitutional right of equal access to medical care under the Eighth and Fourteenth Amendments to the United States Constitution.

64. At all times relevant herein, the § 1985 Individual Defendants were acting under color of the law of the State of New Jersey.

65. The conduct by the § 1985 Individual Defendants constituted deliberate and outrageous indifference to plaintiff's constitutional rights and the § 1985 Individual Defendants abused their authority by acting with deliberate indifference to, and with reckless, willful and callous disregard for, the known substantial risk of injury to plaintiff, in deprivation of his constitutional rights.

66. As a direct and proximate result of the foregoing deliberate indifference on the part of the § 1985 Individual Defendants, plaintiff suffered serious physical, mental, psychological and emotional injury, including pain and suffering.

67. For the foregoing deprivations of plaintiff's constitutional rights, the § 1985 Individual Defendants are liable in their individual capacities for compensatory damages, punitive damages, and reasonable attorney fees and costs, as permitted under 42 U.S.C. §§ 1985 and 1988.

20

<u>Third Cause of Action</u>

Failure to Prevent Conspiracy to Violate Civil Rights,
42 <u>U.S.C.</u> § 1986

(Individual Capacity Claims Against Sandra Connelly,
Sharmalie Perera, and Latia Fedei)

68. Plaintiff incorporates herein paragraphs 1 through 67 as though set forth in full.

69. Defendants Sandra Connelly, Sharmalie Perera and Latia Fedei (the "§ 1986 Individual Defendants"), are liable for failing to prevent a conspiracy to deprive plaintiff equal access to medical care.

70. As a result of the foregoing, the § 1986 Individual Defendants deprived plaintiff of his constitutional right to medical care under the Eighth and Fourteenth Amendments to the United States Constitution.

71. At all times relevant herein, the § 1986 Individual Defendants were acting under color of the law of the State of New Jersey.

72. The conduct by the § 1986 Individual Defendants constituted deliberate and outrageous indifference to plaintiff's constitutional rights and the § 1986 Individual Defendants abused their authority by acting with deliberate indifference to, and with reckless, willful and callous disregard for, the known substantial risk of injury to plaintiff, in deprivation of his constitutional rights.

73. As a direct and proximate result of the foregoing deliberate indifference on the part of the § 1986 Individual Defendants, plaintiff suffered serious physical, mental, psychological and emotional injury, including pain and suffering.

21

74. For the foregoing deprivations of plaintiff's constitutional rights, the § 1986 Individual Defendants are liable in their individual capacities for compensatory damages, punitive damages, and reasonable attorney fees and costs, as permitted under 42 U.S.C. §§ 1986 and 1988.

Fourth Cause of Action

Violations of the Americans with Disabilities Act ("ADA"),
42 U.S.C. § 12101, et seq.

(Official Capacity Claims Against Gary Lanigan, UCHC, Michelle Ricci, George Robinson, Sandra Connelly, Sharmalie Perera, and John Doe #1)

75. Plaintiff incorporates herein paragraphs 1 through 74 as though set forth in full.

76. Plaintiff has a record of being physically disabled as a result of his medical condition and infirmities.

77. At all times herein, plaintiff was qualified to participate in the programs, services, and activities provided by the NJDOC, including equal access to inmate health services.

78. At all times herein defendants Gary Lanigan, UCHC, Michelle Ricci, George Robinson, Sandra Connelly, Sharmalie Perera, and John Doe #1 (the ADA Official Capacity Defendants) deprived plaintiff of access to medical care on two occasions in 2017 when they:

   a) Refused to provide reasonable accommodations necessary for him to be safely transported to prescribed medical appointments and court trips.

22

b) failed to provide wheelchair accessible medical transport so he could attend his medical appointments and court hearings and attend them without being subjected to serious injury.

c) ignored the prescription for wheelchair accessible medical transport previously entered into plaintiff's EMR by Nurse Guida.

d) purged from his medical record the accommodation for medical transport previously prescribed by Nurse Guida.

79. For the foregoing deprivations of plaintiff's rights, the ADA Official Capacity Defendants are liable in their official capacities for compensatory damages, punitive damages, as well as reasonable attorneys' fees and costs.

80. Further, in accordance with the enforcement provisions of the ADA, plaintiff seeks injunctive relief enjoining the ADA Defendants from discriminating against him by denying or depriving him reasonable, safe, and medically appropriate transport accommodations for medical appointments and court hearings; investigation and enforcement of his ADA claims by the Attorney General; the imposition of appropriate civil penalties; and reasonable attorney fees and costs. 42 U.S.C. §§ 12188 and 12205.

### Fifth Cause of Action

Violations of Section 504 of the Rehabilitation Act of 1973,
29 U.S.C. § 794(a);

(Official Capacity Claims Against Gary Lanigan, UCHC, Michelle Ricci, George Robinson, Sandra Connelly, Sharmalie Perera, and John Doe #1)

81. Plaintiff incorporates herein paragraphs 1 through 80 as though set forth in full.

23

82. On information and belief, the NJDOC receives federal financial assistance in connection with operations and programs provided by its facilities.

83. Plaintiff has a record of being physically disabled as a result of his medical condition and infirmities.

84. At all times herein, plaintiff was qualified to participate in the programs, services, and activities provided by the NJDOC, including equal access to inmate health services.

85. Defendants Gary Lanigan, UCHC, Michelle Ricci, George Robinson, Sandra Connelly, Sharmalie Perera, and John Doe #1 (the Section 504 Official Capacity Defendants) deprived plaintiff of access to medical care on two occasions in 2017 when they:

    e) Refused to provide a reasonable accommodations necessary for him to be safely transported to prescribed medical appointments and court trips.

    f) failed to provide wheelchair accessible medical transport so he could attend his medical appointments and court hearings and attend them without being subjected to serious injury.

    g) ignored the prescription for wheelchair accessible medical transport previously entered into plaintiff's EMR by Nurse Guida.

    h) purged from his medical record the accommodation for medical transport previously prescribed by Nurse Guida.

86. For the foregoing deprivations of plaintiff's rights under Section 504 of the Rehabilitation Act of 1973, the Section 504 Official Capacity Defendants are liable in

24

their official capacities for compensatory damages, punitive damages, as well as reasonable attorneys' fees and costs.

87. Further, in accordance with the enforcement provisions of the Rehabilitation Act, plaintiff seeks injunctive relief enjoining the Section 504 Official Capacity Defendants from discriminating against him by denying or depriving him reasonable, safe, and medically appropriate transport accommodations for medical appointments and court hearings; the imposition of appropriate civil penalties; and reasonable attorney fees and costs.

### Sixth Cause of Action

### Professional Negligence

(Against UBHC, Sandra Connelly, Sharmalie Perera, APN Latia Fedei, SFMC, Jane Doe ##1-2, John Doe #3, and Nurse Register)

88. Plaintiff incorporates herein paragraphs 1 through 87 as though set forth in full.

89. Defendants UBHC, Sandra Connelly, Sharmalie Perera, APN Latia Fedei, SFMC, Jane Doe ##1-2, John Doe #3, and Nurse Register each owed plaintiff a duty to exercise reasonable skill and care to provide accommodations so plaintiff could gain equal access to medical treatment, document and report his injuries, and to provide medically appropriate treatment for his injuries and to alleviate his pain and suffering.

90. By their actions and omissions, the foregoing defendants breached their respective duties of care by failing to provide transport accommodations so plaintiff could gain equal access to medical treatment, failing to document and report plaintiff's injuries, refusing to evaluate his medical condition, failing to provide medically

25

appropriate treatment for his injuries, pain, and suffering, and by refusing such treatment for non-medical and/or discriminatory reasons.

91. The foregoing defendants are liable to plaintiff because their actions and omissions injured plaintiff and because the injuries suffered by plaintiff were proximately caused by their actions and omissions.

Seventh Cause of Action

Negligence

(Against John Doe ##1-2)

92. Plaintiff incorporates herein paragraphs 1 through 91 as though set forth in full.

93. Defendant John Doe #1 owed plaintiff a duty to exercise reasonable skill and care to investigate and to provide a transport accommodation so plaintiff could gain equal access to medical treatment on October 15, 2018.

94. Defendant John Doe #2 owed plaintiff a duty to drive the Death Van in a reasonable manner to prevent injury to its occupants and to report plaintiff's injury during the trip on October 15, 2018.

95. By their actions and omissions, the foregoing defendants breached their respective duties of care by failing to investigate and provide a transport accommodation, by failing to drive the Death Van in a reasonable manner, and by failing to document and report plaintiff's injuries.

96. The foregoing defendants are liable to plaintiff because their actions and omissions injured plaintiff and because the injuries suffered by plaintiff were proximately caused by their actions and omissions.

26

### Eighth Cause of Action

### Intentional Infliction of Emotional Distress

(Against Sandra Connelly, Sharmalie Perera, APN Latia Fedei,
Jane Doe ##1-2, John Doe ##1-3, and Nurse Register)

97. Plaintiff incorporates herein paragraphs 1 through 96 as though set forth in full.

98. The above defendants acted wantonly, intentionally or recklessly as alleged in this complaint thereby causing plaintiff to suffer emotional distress so severe that no reasonable person could be expected to endure it.

99. Defendants' actions and omissions were so extreme and outrageous as to go beyond all bounds of human decency.

100. As such, defendants are liable to plaintiff for the intentional infliction of emotional distress.

### Ninth Cause of Action

### Fraudulent Concealment of Evidence

(Against Sandra Connelly, Sharmalie Perera,
Jane Doe ##1-2, John Doe ##2-3, and Nurse Register)

101. Plaintiff incorporates herein paragraphs 1 through 100 as though set forth in full.

102. Defendants Sandra Connelly, Sharmalie Perera, Jane Doe ##1-2, John Doe ##2-3, and Nurse Register are liable to plaintiff for fraudulent concealment of evidence because:

a) Defendants Connelly and Perera breached the legal duty imposed on them by N.J.A.C. 13:35-6.5(b) to ensure that plaintiff's treatment records accurately

27

reflected the treatment or services rendered when they purged Nurse Guida's transport prescription from plaintiff's EMR and when they failed to report and record in plaintiff's EMR the injuries they observed during their physical examination of plaintiff on or about October 16, 2018, all of which was contrary to N.J.S.A. 2C:21-4.1 and N.J.S.A. 2C:28-6(1).

b) Defendant Jane Doe #1 and John Doe ##2-3 breached the legal duty imposed on them by N.J.A.C. 13:35-6.5(b) by failing to report and record in plaintiff's medical record the injuries they observed during their physical examination of plaintiff on or about October 15, 2018.

c) Defendant Jane Doe #2 and Nurse register breached the legal duty imposed on them by N.J.A.C. 13:35-6.5(b) by failing to report and record in plaintiff's medical record the injuries they observed during their physical examination of plaintiff on or about October 15, 2018, and further breach the legal duty imposed on them by N.J.S.A. 2C:21-4.1 and N.J.S.A. 2C:28-6(1) when they altered plaintiff's EMR to conceal the injuries he suffered in the Death Van on or about October 15, 2018.

103. The evidence purged, omitted, altered and/or concealed by the above-named defendants is material to prove the truth of claims raised by plaintiff both in his prior administrative grievances actions as well as in this litigation.

104. Plaintiff could not reasonably have obtained access to the evidence from any other source.

105. Defendants intentionally purged, omitted, altered, concealed, withheld or destroyed the evidence with the purpose to disrupt plaintiff's administrative grievance

28

actions knowing that plaintiff's treatment records were evidence in support of his previously filed administrative grievances actions about being injured in the Death Van.

106.   Plaintiff is damaged both in his ability to establish the truth of his administrative grievance actions and in the underlying action by having to rely on an evidential record that did not contain the evidence purged, omitted, altered, concealed, withheld or destroyed.

## Prayer for Relief

WHEREFORE, plaintiffs seek judgment against defendants as follows:

A.  For compensatory and consequential damages;

B.  For nominal damages;

C.  For exemplary and/or punitive damages in an amount sufficient to deter and to make an example of defendants because their actions and/or inactions, as alleged, were motivated by evil motive or intent, or involved reckless or callous indifference to plaintiff's federally protected rights, or were wantonly or oppressively done;

D.  For injunctive relief enjoining defendants from denying plaintiff reasonable accommodations for safe transport to and from medical appointments and court hearings;

E.  For appointment of counsel pursuant to 28 U.S.C. §1915(e)(1), 42 U.S.C. § 2000a–3(a), or any other provision or the court's discretion;

F.  For an award of reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988, and any other statute or law as may be applicable; and

G.  For an award of any other further relief as the Court deems fair, just, and equitable.

29

<u>Jury Demand</u>

Pursuant to Federal Rule of Civil Procedure 38(b), plaintiff demands a trial by jury on all counts for which a right to a jury trial exists.

Executed:  February 25, 2021

CRAIG F. SZEMPLE